## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **ABHISHEK MAWLE,** | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **Civil No. CC-08-64** |
| | § | |
| **TEXAS A&M UNIVERSITY—** | § | |
| **KINGSVILLE, ET AL.,** | § | |
| **Defendants** | § | |

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Abhishek Mawle is a citizen of Northern India who at all relevant times was an international graduate student pursing a Master's Degree in Business Administration at Texas A&M University – Kingsville ("the University").  This case arises from his probation, one year suspension, and subsequent expulsion from the University in 2008.  Plaintiff contends the sanctions imposed against him are based on false allegations that he sexually harassed a female student, plagiarized two term papers, and made two "threatening" statements.  Plaintiff sues the University and three of its faculty members for denying him substantive and procedural due process, discriminating against him based on his natural origin, and/or retaliating against him for filing a grievance.  *See* 42 U.S.C. §§§ 1983, 1981, 2000d.  Pending before the Court is Defendants' motion for summary judgment.  For the reasons discussed below, Defendants' motion for summary judgment is GRANTED (D.E. 42).

## I.       BACKGROUND

In the fall semester of 2007, Plaintiff was enrolled in a finance course taught by Dr. Priti Verma and an economics course taught by Dr. Syed Harun.  Plaintiff was

required to submit term papers in both classes.  According to his sworn affidavit, Plaintiff

was the only Indian national student in the College of Business, and both professors

treated him differently than other students.  Plaintiff explains:

> Dr. Priti Verma is from the southern region of India known as "Tamil."
> Tamilians have had racial and political conflict with the northern region of
> India where I originate.  The other professor, Dr. Syed M. Harun, is a
> Muslim and originates from Bangladesh.  There is also conflict by
> Muslims against other religions such as Hindus.  I was treated differently
> by Dr. Verma because I am from the northern region of India; I have a
> different ethnic background and I was treated differently by Dr. Harun [I]
> because I am not Muslim, but instead affiliated with the Hindu religion.

According to Plaintiff, he turned in a hard copy of his term paper to Dr. Verma at the end

of **November, 2007**, but never discussed it with him.  Plaintiff testifies that he did not

intentionally plagiarize the paper.

According to the sworn affidavit of Jane H. Stanford, Interim Dean of the College

of Business Administration ("Dean Stanford"), on **November 30, 2007**, Dr. Verma

submitted Plaintiff's term paper to Turnitin, a service designed to detect "cut and paste"

plagiarism in student work.  On **December 10, 2007**, Dr. Verma sent the following e-

mail to Plaintiff:

> I have received your research project.  This is not what had to be done in
> the research report.  You had to identify a research question and do a
> relevant literature review.  Also, there are no references in the paper.  Can
> you send me the electronic version of your paper ASAP?
>
> Please come and see me in my office tomorrow between 12:30 pm and
> 1:00 pm.  I also need to talk to you about both the projects.

The next day, Plaintiff sent an electronic version of his paper to Dr. Verma via e-mail.

On **December 12, 2007**, Plaintiff sent a follow-up e-mail to Dr. Verma apologizing for

not being able to meet with him and asked that Dr. Verma "[P]lease let me know when I

could meet you."  According to Plaintiff, Dr. Verma did not respond to the e-mail or

otherwise make any effort to contact him.  According to Dean Stanford's affidavit, because the Turnitin report showed an extremely high "similarity index" of 70%, Dr. Verma gave Plaintiff an "F" in the course.  On **December 13, 2007**, Plaintiff e-mailed Dr. Verma requesting that his grade be changed from an "F" to an "I" so that he could retake the course:

> Since I cannot afford to pay the Tuition Fee again and it would make me ineligible for the scholarship, I assure you, I will take the class next semester from Beginning and finish the course.

According to Plaintiff's affidavit, as a result of having to travel to India for medical treatment, he had missed a significant amount of class that semester.

Plaintiff turned in his term paper for Dr. Harun's class in early **December, 2007**. Plaintiff testifies that he did the work, gave credit to the sources he cited, and did not "cut and paste."  The paper included the following disclaimer:

> Every effort has been made by me to ensure the accuracy of the information supplied in these pages, and to the best of my knowledge and belief, which are discussed in these pages.  However, I am conscious that there may be unintentional errors or omissions, and that any which is discovered should be reported to me on my email address … I will correct them as soon as possible.  Your cooperation is welcome in this aspect.

On **December 6, 2007**, Dr. Harun e-mailed Plaintiff the following:

> Please come to see me today between 1:30-2:00 pm in my office.  I need to talk to you.  I have serious concerns about your term paper.  It is very important!

Plaintiff went to see Dr. Harun, but upon arrival at his office Plaintiff was advised that Dr. Harun's father had passed away and that Dr. Harun would not return to campus until 2008.

According to the sworn affidavit of Frank B. Ureno, Associate Vice President and Dean of Students ("Dean Ureno"), on **January 18, 2008**, "a report was made to the

University Police Department by a female student [Jannah Ellyse Morales] alleging that she was being sexually harassed by Mr. Mawle."  Dean Ureno received the complaint on January 24, 2008, and according to him, the complaint reported that "… Mr. Mawle had persisted by calling and emailing the complainant including sending her messages on 'My Space," and attempting to give gifts to the complainant."  Plaintiff contends Ms. Morales is the daughter of a University employee and that her complaint was "unfounded and trumped up."  In his affidavit, Plaintiff states the following:

> Ms. Morales told me that one of her parents works for Texas A&M University – Kingsville.  Ms. Morales has publicly made derogatory statements about my nationality, Indian, which the University knew, or should have know[n], about.  Further, she made a statement on her Myspace page to the effect that she asked her friend to testify falsely against me.

Plaintiff also offers the following entry made by Ms. Morales to "Sara" on her My Space page:  "You made by day :D Thank you for testifying against crazy [I]ndians for me and for smiling and going along with me making an ass of myself."

On **January 26, 2008**, Plaintiff e-mailed Dr. Harun the unedited version of his term paper and requested "[P]lease let me know the changes you would like to be incorporated."  The paper included the same disclaimer described above.

In her affidavit, Dean Stanford states that on **January 27, 2008**, she received via e-mail a "formal letter of grievance" from Plaintiff complaining that Dr. Verma and Dr. Harun were discriminating against him.  Plaintiff also requested that his grade be changed to an "I" and that he be allowed to retake the courses.  In his letter, Plaintiff explains that he is from the northern part of India while Dr. Verma, who belongs to the "Tamilian" community, is from the southern part of India:

> It is a well know[n] fact in the social circles of India that the "Tamilian" community and the northern community do not gel well and hence the hatred, which is being vented out in the form of unjust academic punishments including awarding me an 'F' Grade in the course and last but not the least I am receiving a similar treatment from Dr. Harun in reference to my courses so far under him.
>
> Both Dr. Verma and Dr. Harun are from the same region, from where I belong, hence this "racial cum political conflict" between us is going on, the unfortunate effect of this being me getting discriminated academically in Dr. Verma's course and so far I have had similar experiences with Dr. Harun.  It is apparently very clear that they are determined to create problems for me in the present courses as well as in the future courses that I need to take under them.

Dean Stanford responded to Plaintiff via e-mail the following day, requesting clarification on whether Plaintiff's grievance was a complaint about harassment or a grade appeal or both.  She also asked if Plaintiff had any evidence of harassment and requested that he schedule an appointment with her on January 29, 2008.

On **January 30, 2008**, Dr. Harun submitted Plaintiff's term report to Turnitin for review, which showed a similarity index of 88%.  According to Dean Stanford's affidavit, based on the severity of the plagiarism in the report, Dr. Harun recommended Plaintiff be given a zero on the report, which would result in Plaintiff receiving an "F" in the course.  Before submitting the grade, Dr. Harun consulted with Dean Stanford on whether an "F" was a "just and fair assessment."  Dean Stanford agreed a grade of "F" was appropriate.

On **January 31, 2008**, Plaintiff met with Dean Stanford to discuss his discrimination grievance.  According to her affidavit, Dean Stanford explained to Plaintiff the difference between academic and non-academic grievances or appeals, provided him a copy of the *Student Handbook*, and "tried to discuss with him the concept

of 'due process.'"  In his sworn affidavit, Plaintiff claims that during their discussion Dean Stanford asked/told him, "Why don't you just go back to India."

On **February 4, 2008**, Dean Stanford filed a complaint of "suspicious circumstances" with the University Police Department.  The complaint describes the events surrounding Plaintiff's alleged plagiarism and the reporting officer's discussions with Professors Verma and Harun regarding same.  On that same day, Plaintiff met with Dean Ureno to discuss Ms. Morales's sexual harassment complaint.

On **February 5, 2008**, Dean Stanford co-signed a letter with Dr. Harun informing Plaintiff that he received an "F" in the economics course.

According to the sworn affidavit of Dr. Terisa Remelius, Vice President for Student Affairs ("Dr. Remelius"), on **February 7, 2008**, the University Police Department received a report from a student that Plaintiff, while talking about the plagiarism charge against him, said "I understand why people shoot up or bomb schools in America ..."  The report was forwarded to the Dean Ureno, who placed Plaintiff on interim suspension from campus.  In his letter to Plaintiff, Dean Ureno explains that Plaintiff's comment "may be construed as terroristic threats to students at this University" and that "[U]nder our disciplinary procedures, a hearing must be held within three business days of the suspension to review these allegations."  Plaintiff met with Dean Ureno on **February 11, 2008**, to "discuss the due process matters related to the hearing." Plaintiff requested a hearing before the University Disciplinary Committee and waived his right to delay the hearing; Plaintiff preferred to expedite the hearing in order to return to campus.  In a letter also dated **February 11, 2008**, Dean Ureno advised Plaintiff that he would be on probation for the remainder of the 2008 spring semester as a result of the

sexual harassment complaint made by Ms. Morales.  Plaintiff was advised of his right to appeal the decision but did not do so.

In a letter dated **February 12, 2008**, Crispin Trevino, Chair of the University Disciplinary Committee ("Chair Trevino") advised Plaintiff the following:

> Therefore, based on all the information available to this committee we have concluded that you are allowed to return to the university and have assessed an educational requirement sanction.  An *Educational Requirement* includes a provision to complete a specific educational requirement directly related to the violation committed, i.e. counseling, attending alcohol workshops, writing essays, making reports, etc.  Your return to the university is contingent upon an assessment and evaluation by the university counseling center or a professional counseling agency of your choice and that you adhere to the stipulations of such findings of the evaluation and assessment.
>
> If you are not in agreement with this action, you may appeal this decision to Dr. Remelius, Vice President for Student Affairs.

Plaintiff did not appeal the committee's decision.

On **February 18 and 19, 2008**, Dean Stanford advised Plaintiff of her decision to uphold both plagiarism charges and both grades of "F."  She also advised Plaintiff of his right to appeal her decision.  On **February 21, 2008**, Plaintiff appealed Dean Stanford's decision to Dr. Remelius for consideration by the Judicial Appeals Board.  Four days later on **February 25, 2008**, Dean Stanford advised Plaintiff of and explained her decision to expel him from the University:

> According to the Texas A&M University – Kingsville *2007-2009 Graduate Catalog*, page 77, serious cases of repeated plagiarism typically result in expulsion of students from the University.
>
> In this case, enough evidence of serious, repeated plagiarism has been revealed that I believe you are responsible for these acts.  Furthermore, I have made the decision, in consultation with the dean of students, Mr. Frank Ureno, to issue you the sanction of immediate expulsion from Texas A&M University – Kingsville.  This sanction adheres to the policy and procedure under "Academic Misconduct" … and it is congruent with

"Disciplinary Actions" of the Texas A&M University – Kingsville *2007-2008 Student Handbook*.

You are entitled to appeal this decision. The appeal process is on page 42, 4-5, Texas A&M University – Kingsville *2007-2008 Student Handbook*. In fact, Dr. Terisa Remelius, Vice President for Student Affairs indicated to me that you have already submitted two appeal forms to her for consideration by the Judicial Appeals Board. Dr. Remelius will be in touch with you about your appeal process as outlined in the *Student Handbook.*

You will be allowed to attend classes and meetings on campus pending the outcome of any appeals you choose to file. If the Judicial Appeals Board and/or Provost uphold my decision to expel you from Texas A&M University – Kingsville, you will be forced to leave campus immediately, you will not receive credit for any courses this semester, you will not be allowed to enroll in the future, and a hold will be placed on your transcripts.

On **February 27, 2008**, Dr. Remelius advised Plaintiff that (1) the Judicial Appeals Board voted unanimously that his case did not warrant a hearing, and (2) the members have chosen to uphold Dean Stanford's decision to expel him based on serious or repeated acts of plagiarism. Dr. Remelius also advised Plaintiff of his "one last appeal process," which required him to submit a new copy of the Disciplinary Appeal Request Form to Dr. Kay Clayton, Provost and Vice President Division of Academic Affairs ("Dr. Clayton").

By letter dated **February 29, 2008**, Dean Ureno placed Plaintiff on interim suspension a second time based on an allegation that Plaintiff had "made some comments to a study group that may be characterized as threats against students, faculty, staff, and the general public at this University." According to a letter dated March 5, 2008, from Chair Trevino to Plaintiff, which is attached to Dr. Remelius's affidavit, the following conduct forms the basis of this allegation:

On February 25, 2008 several students from a study group at the library came into the University Police Department to express their concerns regarding disturbing comments made by you.  They also wanted to know what the University was doing to have you removed from school based on the comments and information that you allegedly shared with them.  The committee reviewed an affidavit made by Mr. Hinojosa on February 28, 2008 recounting the incident that had allegedly occurred on Monday, February 25, 2008.  The affidavit stated that you had informed him and other of your problems with Dean Stanford, claimed you had been cleared by the FBI and CIA, and said everyone should have been told about you and your bomb threat.  It also alleges that you proceeded to say "this isn't over and wait till graduation."

Dean Ureno advised Plaintiff that a hearing needed to be held within three business days to review the allegations.

On **March 3, 2008**, counsel for Plaintiff, Gay Gilson, advised Dr. Clayton that she had been retained to represent Plaintiff in appealing the Judicial Appeal Board's decisions concerning the plagiarism charges and Plaintiff's expulsion. Ms. Gilson provided a lengthy description of the bases for the appeal and requested that certain documents be provided to her.  On **March 6, 2008**, Jorge D. Canalas, Assistant General Counsel for Texas A&M, provided Ms. Gilson with the documents she had requested.

On **March 5, 2008**, the University Disciplinary Committee held a hearing on Plaintiff's second interim suspension.   The committee concluded Plaintiff was responsible for the charge and should be suspended from campus for one year, effective March 6, 2008, through March 6, 2009.   Chair Trevino advised Plaintiff of the committee's decision and his right to appeal the decision to Dr. Remelius.  Plaintiff appealed the decision to Dr. Remelius, whose responsibility was "to determine if the evidence against Mr. Mawle was sufficient and whether Mr. Mawle had been allowed due process in accordance with the *Student Handbook* and the policies of the University." Dr. Remelius upheld the committee's decision and affirmed Plaintiff's one-year

suspension.  Dr. Remelius notified Plaintiff of his decision by letter dated **March 26, 2008**.

On **April 4, 2008**, Dr. Ronald Hy, Interim Provost and Vice President for Academic Affairs (Interim Provost Hy), notified Plaintiff that his appeal of the plagiarism charges would be resubmitted to the Judicial Appeal Board.

> As you are aware, the packet of materials submitted to me for consideration was created by your attorney, Ms. Gay Gilson.  It became apparent to me that new information is included which was not considered by the Judicial Appeals Board because it was not provided by you at that time.  For that reason, I am remanding your case back to the Judicial Affairs Board for review and consideration of this new information as well as for a full, independent hearing for each allegation of plagiarism.  Dr. Terisa Remelius, Vice President for Student Affairs, will be in contact with you and with the information on the hearing dates, times, and locations as well as any other materials you may need to prepare or present your case.

In two letters dated **April 10, 2008**, Dr. Remelius advised Plaintiff that two hearings before the Judicial Appeals Board on both charges of plagiarism were scheduled for April 17, 2008.  The notices informed Plaintiff that he was being charged with "academic dishonesty" for plagiarism and lying and explained that certain persons may be called to testify and that certain documents may be reviewed at the hearings.  Plaintiff was advised of his right to present documents and witnesses and "have an advisor present at the hearing, but the advisor is not permitted to represent you nor is (s)he permitted to speak to any Board member."

On **April 17, 2008**, two separate Judicial Appeals Boards heard Dr. Harun and Dr. Verma's plagiarism charges separately.  Plaintiff and Ms. Gilson were present at both hearings where Plaintiff had the opportunity to cross-examine the witnesses and present witnesses of his own.   The Boards ultimately found Plaintiff was responsible for

plagiarism in both classes.  Based on these findings, Dean Stanford imposed a sanction of immediate expulsion against Plaintiff.  On **April 24, 2008**, Dean Stanford advised Plaintiff of the sanction and his right to appeal same.  On **April 25, 2008**, Gay Gilson filed an appeal of the expulsion sanction as being "excessive or inappropriate."  By letter dated **May 1, 2008**, Dr. Remelius advised Plaintiff that a hearing concerning his expulsion would be held before the Judicial Appeals Board on May 5, 2008.  Plaintiff was again advised of his right to present documents and witnesses and "have an advisor present at the hearing …"  Dr. Remelius also advised Plaintiff that he could appeal the decision of the Judicial Appeals Board to Interim Provost Hy, "due to the fact that the possible outcome is suspension or expulsion."

On **May 5, 2008**, a Judicial Appeals Board heard Plaintiff's appeal of the expulsion sanction.  Plaintiff and Ms. Gilson were present at the hearing where Plaintiff again had the opportunity to cross-examine the witnesses and present witnesses of his own.  The Board voted to uphold Dean Stanford's decision to expel Plaintiff from the University.  On **May 9, 2008**, Plaintiff appealed the Board's decision to Interim Provost Hy, who denied the appeal and upheld Dean Stanford's and the Board's decision to expel Plaintiff form the University.

According to his sworn affidavit, Plaintiff "had no disciplinary problems prior to filing the racial grievance."

## II.    ANALYSIS

### A.    Substantive Due Process

Plaintiff claims he has a property interest in his continued education at the University and that his substantive due process rights were violated when he was

expelled for plagiarizing. Plaintiff claims the University's finding that he plagiarized was "irrational, arbitrary, and capricious" because the evidence shows he did not intend to plagiarize or submit other's work as his own.[1]  He sues Rumaldo Juarez in his official capacity as President of the University ("President Juarez"), Dean Stanford in her individual and official capacities, and Dean Ureno in his individual and official capacities, pursuant to 42 U.S.C. §1983.  Defendants Juarez, Stanford, and Ureno move for summary judgment that (1) they did not deny Plaintiff his substantive due process rights, and (2) Plaintiff's claims brought against them in their official capacities are barred by the Eleventh Amendment to the United States Constitution.

Summary judgment is appropriate if the record, viewed in the light most favorable to the non-moving party, "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Lawrence v. University of Texas Medical Branch at Galveston*, 163 F.3d 309, 311-312 (5th Cir. 1999) (citing FED. R. CIV. P. 56(c)).  The moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact.  *Id*.  Once the moving party makes and properly supports a motion for

---

[1]  The legal bases offered by Plaintiff in support of this claim are inconsistent and not well pled. Plaintiff first claims Defendants' finding that he plagiarized was arbitrary.  The Court acknowledges that such provides a legitimate basis for stating a substantive due process violation.  Plaintiff then switches gears.  Citing *Dixon v. Alabama State Bd. of Ed.*, 294 F.2d 150, 158 (5th Cir. 1961), Plaintiff contends he was expelled for *disciplinary* reasons as opposed to *academic* reasons and therefore was entitled to more stringent due process.  The Court in *Dixon* held that due process requires notice and some opportunity for hearing before a student at a tax-supported college can be expelled for misconduct.  *Id*.  The Court acknowledges that *procedural* due process requirements may vary depending on whether the action taken is "disciplinary" versus "academic."  *See Bd. of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 55 L.Ed.2d 124 (1978).  However, in his response to Defendants' motion for summary judgment, Plaintiff reiterates that he "is not alleging procedural process regarding this issue, but denial of *substantive* due process rights."  *See* D.E. 43, page 11.  As such, the Court will only address Plaintiff's claim that his substantive due process rights were violated with respect to his being expelled for plagiarism.

summary judgment, the non-moving party must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial.  *Id*.  Neither "unsubstantiated assertions" nor "conclusory allegations" can satisfy the non-moving party's burden.  *Id*.  Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12 (1986); *Baton Rouge Oil and Chemical Workers Union v. ExxonMobil*, 289 F.3d 373, 375 (5th Cir. 2002).

To state a substantive due process claim, a plaintiff must show that the government's deprivation of a property interest[2] was arbitrary or not reasonably related to a legitimate governmental interest.  *Williams v. Texas Tech University Health Sciences Center*, 6 F.3d 290, 294 (5th Cir. 1993) (citing *Brennan v. Steward*, 834 F.2d 1248, 1256 (5th Cir. 1988).  In *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985), the Supreme Court recognized that decisions in the academic setting are subject to "a narrow avenue for judicial review" under a substantive due process standard.  *Wheeler v. Miller*, 168 F.3d 241, 249 (5th Cir. 1999) (citing *Ewing*, 474 U.S. at 227).

> When judges are asked to review the substance of a genuinely academic decision … they should show great respect for the faculty's professional judgment.  Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person

---

[2] Neither the Supreme Court nor the Fifth Circuit Court of Appeals has held that a graduate student has a constitutionally-recognized property interest in his education at a state university. Both courts have "assumed without deciding" the existence of such an interest or deemed it unnecessary to decide same by evaluating whether procedural due process had been afforded to the students in those cases. *See Regents of University of Michigan v. Ewing*, 474 U.S. 222, 106 S.Ct. 507 (1985); *Board of Curators of the University of Missouri v. Horowitz*, 948 U.S. 78, 55 L.Ed.2d 124 (1978); *Dixon v. Alabama State Bd. of Ed.*, 294 F.2d 150, 158 (5th Cir. 1961).

or committee responsible did not actually exercise professional judgment. *Ewing*, 474 U.S. at 225.

In *Wheeler v. Miller*, 168 F.3d 241, 249-50 (5th Cir. 1999), the Fifth Circuit analyzed the scope of *Ewing*.  In *Wheeler*, a graduate student at Texas Woman's University who was pursuing a Ph.D. is psychology claimed that false accusations of cheating resulted in his poor grades and ultimate dismissal from the doctorate program. In denying Wheeler's claim that his substantive due process rights had been violated, the Fifth Circuit explained:

> Legally, for purposes of substantive due process, we do not see as relevant Wheeler's characterization of the actions taken as all linked to the cheating accusations.  Even if Wheeler's characterization were correct, the actions taken by TWU were nonetheless "genuinely academic decision[s]" under the *Ewing* substantive due process standard.  While the Court in *Horowitz*[3] noted that *procedural* due process requirements may vary depending on whether the action taken is "disciplinary" versus "academic," all of the decisions taken by TWU – those regarding grades, the remediation plans, and the award of a degree – are genuine academic decisions under *Ewing*.  *Ewing*, in delineating a student's substantive due process rights, did not hold that genuine academic decisions and the standard for judicial review of such decisions are limited only to those decisions based purely on test scores or some other objective academic criteria.

In *Williams v. Texas Tech University Health Science Center*, 6 F.3d 290 (5th Cir. 1993), the Fifth Circuit applied *Ewing* to a state university professor's claim that a reduction of his salary violated his substantive due process rights.  *Williams*, 6 F.3d at 294.  Relying on testimony that the professor's salary had been reduced for lack of grant productivity and lack of funded grant salary support, the Court considered the University's decision to be an "academic decision" within the meaning of *Ewing* and

---

[3] *Bd. of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978).

affirmed the district court's granting summary judgment that there was no substantive due process violation.  *Id.*

In light of this precedent, the Court finds Defendants' decision to expel Plaintiff for plagiarizing was an "academic decision" within the meaning of *Ewing* and was not irrational, arbitrary, or capricious.  Plaintiff has not pled or demonstrated that Defendants did not exercise professional judgment in concluding that Plaintiff had plagiarized or that expulsion was the appropriate sanction for same.  The record demonstrates the opposite.

It is undisputed that Professors Verma and Harun submitted Plaintiff's papers to Turnitin, which is a web-based plagiarism prevention system commonly utilized by professors.[4]  The Turnitin reports revealed that a substantial portion of Plaintiff's papers had been plagiarized.  According to Dean Stanford's sworn affidavit,

> The Trunitin plagiarism prevention report in Dr. Verma's Finance course
> … detected a 70% similarity index in the paper turned in by Mr. Mawle.
> According to such report, 36% of the paper was a match for material
> found in wikipedia.com, the online encyclopedia.  The Trunitin plagiarism
> prevention report in Dr. Harun's Economics course showed an 88%
> similarity index on a paper turned in by Mr. Mawle … There are
> substantial matches with material found in several recognized online
> sources.
>
> It is my opinion that Mr. Mawle presented papers in the two classes which
> he had prepared by cutting and pasting material from existing sources and
> that he is responsible for plagiarism in both classes.  It is further my
> opinion that due to the extensive nature of the cutting and pasting, there
> was no honest error on the part of Mr. Mawle, nor can the papers be
> justified as honest differences in interpretations or judgments of data.

According to her affidavit, "[A]fter thoughtfully and thoroughly reviewing the allegation and supporting documentation," Dean Stanford upheld the plagiarism charges by both

---

[4]  Attached to Dean Stanford's affidavit is an e-mail to her from Ashley Bennington, Associate Professor in the Management and Marketing Department for the College of Business Administration.  In the e-mail, Professor Bennington states that she has been using Trunitin.com for many years and explains how it is used.  According to her, "any paper with greater than 20 percent is a very serious violation."

professors and sustained both grades of "F" given to Plaintiff. Dean Stanford's subsequent decision to expel Plaintiff was made pursuant to the Texas A&M University – Kingsville *2007-2009 Graduate Catalog*, which provides that serious cases of repeated plagiarism typically result in expulsion of students from the University. In her letter to Plaintiff dated February 25, 2008, Dean Stanford explains that "enough evidence of serious, repeated plagiarism has been revealed that I believe you are responsible for these acts." Dean Stanford's decisions to uphold the plagiarism charges and expel Plaintiff were appealed, reviewed, and sustained by three Judicial Appeals Boards and Interim Provost Hy.

Plaintiff offers his sworn affidavit in which he reurges that he did not plagiarize:

> I did the work to the best of my knowledge based upon the information that had been provided. I did not "cut and paste." I did give attributions and credits to the sources reviewed and cited. I did include bibliographies.

Plaintiff also describes the "custom and practice for submission of written papers that he [I] was exposed to while studying in India." He explains that students in India are allowed to turn in draft papers for review by the professor, who reviews the paper and notifies the student of any errors. The professor allows the student to correct the errors and resubmit the paper for a final grade. Plaintiff states "[T]his is the practice that I believed would be followed at Texas A&M University – Kingsville." To ensure that his professors would review his draft papers and provide feedback, Plaintiff explains that he included the disclaimer described above on the papers he submitted to Professors Verma and Harun. Plaintiff also contends Professors Harun and Verma did not advise him of any applicable citation standards.

Whether Plaintiff in fact plagiarized or whether Defendants reached the *wrong* conclusion regarding same is not for this Court to decide.  Even if Plaintiff did not plagiarize, the issue before this Court is whether Defendants exercised their professional judgment in concluding that Plaintiff had in fact done so. Based on the foregoing, the Court finds Defendants (1) had a legitimate basis to conclude that Plaintiff had plagiarized and should be expelled, and (2) used their professional judgment in making those decisions.

Defendants Juarez, Stanford, and Ureno's motion for summary judgment that they did not violate Plaintiff's substantive due process rights is GRANTED.  Plaintiff's claims that Defendants Juarez, Stanford, and Ureno violated his substantive due process rights are DISMISSED.

In light of this Court's ruling, it is unnecessary for this Court to decide whether Defendants Juarez, Stanford, and Ureno are entitled to Eleventh Amendment immunity from this claim.

### B.     Procedural Due Process

Plaintiff also claims he has a liberty interest in his "good name, honor and integrity" and that Defendants Juarez, Stanford, and Ureno denied him his *federal* right to procedural due process guaranteed by the Fourteenth Amendment to the United States Constitution.  This claim is based on the two suspensions Plaintiff received for making "threatening" statements.  Plaintiff claims Defendants did not afford him the procedural protections provided in TEX. EDUC. CODE §51.243 at his suspension hearings. Specifically, Plaintiff claims he was denied (1) the right to cross-examine witnesses, (2) the right to present witnesses, (3) the right to be represented by counsel, and (4) the right

to have the evidence against him provided to him before the hearing.  *See* TEX. EDUC. CODE §51.243.[5]

Plaintiff sues President Juarez in his official capacity and Deans Stanford and Ureno in their individual and official capacities, pursuant to 42 U.S.C. §1983. Defendants Juarez, Stanford, and Ureno move for summary judgment that (1) they did not deny Plaintiff his procedural due process rights, and (2) Plaintiff's claims brought against them in their official capacities are barred by Eleventh Amendment immunity.

This Court does not need to determine whether Defendants violated the Texas Education Code.  Here, Plaintiff claims his *federal* procedural due process rights were violated and brings his claim under a *federal* statute, 42 U.S.C. §1983.  A violation of Texas law does not necessarily equate with a violation of the United States Constitution. Even if an action by a government entity violates its own rules or those of the state, there is no constitutional deprivation unless the conduct also trespasses on federal constitutional safeguards.  *Ramirez v. Ahn*, 843 F.2d 864, 867 (5th Cir. 1988) (citing *Franceski v. Palquemines Parish School Board*, 772 F.2d 197, 200 (5th Cir. 1985)).

Federal procedural due process for a student disciplinary suspension does not require a formal hearing.  *See Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).  In *Goss*, the Supreme Court held that procedural due process requires, in connection with the suspension of a student from public school for disciplinary reasons, "that the student be given oral or written notice of the charges against him, if he denies

---

[5]  During periods of disruption, the chief administrative officer of a campus or other facility of a state-supported institution of higher education, or an officer or employee of the institution designated by him to maintain order on the campus of facility, may notify a person that consent to remain on the campus of facility under the control of the chief administrative officer has been withdrawn whenever there is reasonable cause to believe that the person has willfully disrupted the orderly operation of the campus or facility and that his presence on the campus of facility will constitute a substantial and material threat to the orderly operation of the campus or facility.  *Id.* at §52.233(a).

them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Bd. of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 98 S.Ct. 948, 952, 55 L.Ed.2d 124 (1978) (citing *Goss*s, 419 U.S. at 581). In *Horowitz*, the Supreme Court reaffirmed:

> "[A]ll that *Goss* required was an 'informal give-and-take" between the student and the administrative body dismissing him that would, at least, give the student 'the opportunity to characterize his conduct and put it in what he deems the proper context.'" *Horowitz*, 98 S.Ct. at 953.[6]

The Fifth Circuit has repeatedly applied and confirmed the Supreme Court's holding in *Horowitz* and therefore *Goss*. *See Shaboon v. Duncan*, 252 F.3d 722, 731 (5th Cir. 2001); *Wheeler*, 168 F.3d at 249; *Davis v. Mann*, 882 F.2d 967, 973 (5th Cir. 1989).

The Court finds the procedural due process afforded Plaintiff in this case was consistent with *Goss*. The record demonstrates that Plaintiff, at the very least, had an "informal give-and-take" with Defendants during which Plaintiff was allowed to explain, defend, or otherwise deny making the alleged "threatening" statements. In fact, the record shows Plaintiff was afforded more procedural process protections than required by federal law.

According to the sworn affidavit of Dr. Remelius, Plaintiff requested and was afforded two hearings before the University Disciplinary Committee to address each statement allegedly made by him. Attached to Dr. Remelius's affidavit is a letter to Plaintiff from Chair Trevino. In the letter Chair Trevino describes what occurred at the disciplinary hearing on February 12, 2008, and advises Plaintiff that the committee "concluded that you are allowed to return to the university and have assessed an

---

[6] "Even in the context of a school disciplinary proceeding, however ,the Court stopped short of requiring a formal hearing since 'further formalizing the suspension process and escalating its formality and adversary nature may not only make it too costly as a regular disciplinary tool but also destroy its effectiveness as a part of the teaching process.'" *Horowitz*, 98 S.Ct. at 955 (citing *Goss*, 95 S.Ct. at 741).

educational requirement sanction [against him]."  Chair Trevino describes what the Court finds to be an informal discussion between Plaintiff, members of the committee, and various witnesses.  Trevino's description demonstrates Plaintiff was given an opportunity to respond to, defend, or otherwise explain his conduct.  It is undisputed that Plaintiff did not appeal the committee's decision.

According to Dr. Remelius's affidavit, the University Disciplinary Committee held a hearing concerning Plaintiff's second "threatening" statement on March 5, 2008. The committee ultimately determined Plaintiff had violated the student code of conduct and suspended Plaintiff for one year.  The hearing minutes show that the hearing lasted over an hour, and that Plaintiff was represented by counsel.  Plaintiff had a detailed discussion with the committee members about the facts surrounding his alleged statement.  Plaintiff objected to the veracity of certain affidavits and called two of his own witnesses, Mr. James and Dr. Perez.  Plaintiff appealed the committee's decision to Dr. Remelius, who denied the appeal and upheld the committee's decision to suspend him for one year.  According to Dr. Remelius's sworn affidavit:

> After careful and thoughtful consideration, I concluded that Mr. Mawle had been provided full and complete due process rights, that he had been notified of the charges against him, that he had been provided copies of the affidavits of witnesses, that he had been given the opportunity of a hearing with his attorney present as an advisor, that he had been given the right to make statements or provide testimony to the committee, that he had called witnesses during the hearing, and that he had been given the right to appeal the decision of the Committee.

Here, Plaintiff disagrees with the University Disciplinary Committee's findings at both hearings.  Plaintiff contends the University offered affidavits that were "unfairly vague" and did not advise him that certain witnesses would be called before the hearings. Plaintiff also complains there was no evidence to substantiate the first "threat" allegation.

Assuming these facts to be true, the Court nevertheless finds Defendants afforded Plaintiff the requisite procedural due process protections under federal law.

Defendants Juarez, Stanford, and Ureno's motion for summary judgment that they did not violate Plaintiff's procedural due process rights is GRANTED. Plaintiff's claims that Defendants Juarez, Stanford, and Ureno violated his procedural due process rights are DISMISSED.

In light of this ruling, it is unnecessary for this Court to decide whether Defendants Juarez, Stanford, and Ureno are entitled to Eleventh Amendment immunity from this claim.

### C.    Discrimination

Plaintiff claims Defendants discriminated against him on the basis of his national origin in violation of 42 U.S.C. §1981 and Title VI of the Civil Acts Right of 1964 ("Title VI"). *See* 42 U.S.C. 2000d *et seq.* Plaintiff contends Defendants suspended and expelled him *because* of his national origin. Plaintiff sues President Juarez in his official capacity and Deans Stanford and Ureno in their individual and official capacities, pursuant to 42 U.S.C. §1983. Plaintiff also sues the University, pursuant to 42 U.S.C. 2000d-7.

The individual defendants move for summary judgment that (1) Plaintiff's claims brought against them in their official capacities are barred by the Eleventh Amendment, and (2) they are entitled to qualified immunity from Plaintiff's claims brought against them in their individual capacities. The University moves for summary judgment that (1) Plaintiff's claim against it is barred by the Eleventh Amendment, and (2) Plaintiff cannot establish a prima facie case of discrimination against it. For the reasons explained below,

the Court finds Plaintiff has failed to show there is a genuine issue of material fact for trial on his discrimination claims. As such, it is unnecessary for this Court to decide the issues of immunity. *See Lawrence v. University of Texas Medical Branch at Galveston*, 163 F.3d 309, 313 (5th Cir. 1999) (citing *Wallace*, 80 F.3d at 1047) ("[B]ecause we hold that Wallace failed to raise a genuine issue of material fact on his claims on the merits, we affirm summary judgment without reaching the issue of qualified immunity").

Section 1981 provides that all persons in the United States shall have the same contractual rights as white citizens. 42 U.S.C. §1981(a); *Harrington v. Harris*, 118 F.3d 359, 367 (5th Cir. 1997) (citing *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 n. 2 (5th Cir. 1996)). Title VI provides that:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. 42 U.S.C. §2000d.

Claims of racial or national origin discrimination brought under §1981 and Title VI are governed by the same evidentiary framework applicable to claims of employment discrimination under Title VII. *LaPierre*, 86 F.3d at 448 n. 2 (citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 2377-78, 105 L.Ed.2d 132 (1989)). *See also Baldwin v. University of Texas Medical Branch at Galveston*, 945 F.Supp.1022, 1031 (S.D. Tex. 1996), aff'd 122 F.3d 1066 (5th Cir. 1997); *Bisong v. University of Houston*, 896 F. Supp.2d 904 (S.D. Tex. 2007). The evidentiary framework for Title VII claims was established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *LaPierre*, 86 F.3d at 448. A Title VII plaintiff bears the initial burden to prove a prima facie case of discrimination by a

preponderance of the evidence. *Id.* The elements of such a claim may vary according the facts of the case and the nature of the claim. *Id.*

To establish a prima facie case of race or national origin discrimination under the *McDonnell Douglas* analysis, the plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he suffered an adverse action; (3) he was qualified to continue in pursuit of his education; and (4) either that he was treated differently from similarly situated students who are not members of the protected class or that he was otherwise expelled because of her race and/or national origin. *Bell v. Ohio State University*, 351 F.3d 240, 253 (6th Cir. 2003); *Bisong v. University of Houston*, 493 F.Supp.2d 896 (S.D. Tex. 2007).

Once established, the plaintiff's prima facie case raises an inference of intentional discrimination. *LaPierre*, 86 F.3d at 448. The burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment action. *Id.* If the defendant comes forward with a reason which, if believed, would support a finding that the challenged action was nondiscriminatory, the inference raised by the plaintiff's prima facie case drops from the case. *Id.* (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255 n. 10, 101 S.Ct. 1089, 1094-95 n. 10, 67 L.Ed.2d 207 (1981)) The focus then shifts to the ultimate question of whether the defendant intentionally discriminated against the plaintiff. *Id.* (citing *St. Mary's Honor Ctr. V. Hicks*, 509 U.S. 502, 510-11, 113 S.Ct. 2742m 2749, 125 L.Ed.2d 407 (1993)).

Direct evidence of an employer's discriminatory intent is rare; therefore, Title VII plaintiffs must ordinarily prove their claims through circumstantial evidence. *Id.* A plaintiff may establish circumstantial evidence of intentional discrimination by

demonstrating that a defendant's articulated nondiscriminatory rationale was pretextual. *Id.* A plaintiff may demonstrate pretext either by showing that a discriminatory motive likely motivated the employer, or that the employer's explanation is unworthy of credence. *Harrington*, 118 F.3d at 368 (citing *Amburgey v. Corhart Refractories Corp.*, Inc., 936 F.2d 805, 813 (5th Cir. 1991)).

Assuming without deciding that Plaintiff has established a prima facie case of discrimination, the Court finds Defendants have adequately rebutted any presumption of discrimination that could arise from a prima facie case by articulating a legitimate, nondiscriminatory reason for Plaintiff's one-year suspension and expulsion, i.e. that Plaintiff had made a "threatening" statement and plagiarized two term papers. It is therefore necessary for Plaintiff to present evidence that Defendants discriminated against him on the basis of his national origin.

As evidence of pretext, Plaintiff submits his sworn affidavit in which he states that Professors Harun and Verma accused him of plagiarism because they were prejudiced against people from Northern India. Plaintiff also states the following:

> Professors Verma and Harun failed to explain to me the standards for citation required for scholarly work in the syllabi for their classes. Neither Dr. Verma nor Dr. Harun made any attempt to educate or steer me as to the requirements for identifying any specific style/format requirement for writing for the course. Further, both Dr. Verma and Dr. Harun both testified at the plagiarism hearing that neither had any set form for citation and there were no set citation requirements.

While these facts may be true, neither Professor Verma nor Professor Harun are named defendants in this case. He is not suing Professors Verma and Harun for discriminating against him. Any discriminatory animus that Professors Verma and Harun may have had toward Plaintiff cannot be imputed to Defendants Juarez, Stanford, and

Ureno.  Plaintiff also reurges that he did not plagiarize and relies on Dean Stanford's comment to him:  "Why don't you just go back to India."  Plaintiff also relies on the fact that Dean Stanford filed a complaint with the University Police Department concerning his plagiarism.  In his affidavit, Plaintiff states "[A]s far as I know, no other student has had a police report filed against them alleging plagiarism."  However, Plaintiff offers no evidence to show or explain why doing so was improper.  Plaintiff concludes "Defendant Stanford was biased toward me because of my racial and did not want me in 'her' School of Business and she wanted me to go back to India for that reason."  He also states the following:

> I believe the plagiarism policy of Texas A&M University – Kingsville has a disparate impact on foreign national students, racial, because the University fails to inform students of citation requirements to avoid plagiarism issues – yet the University punishes the students for not following the policy of which they were never presented.

In his sworn affidavit, Plaintiff states that Dean Ureno told him that he [Plaintiff] should no longer attend the United Methodist Church in Kingsville.  Plaintiff does not explain this statement, the context in which it was made, or how it may be relevant to his discrimination claims.

The Court finds Plaintiff has failed to raise a genuine issue of fact regarding pretext, i.e. that Defendants' decisions to suspend and expel him were made with discriminatory motive.  Apart from Dean Stanford's comment, Plaintiff offers no other evidence of pretext beyond his own bald assertions and beliefs that he has been discriminated against.  Pretext cannot be established by mere "conclusory statements" of a plaintiff who feels he has been discriminated against.  *Amburgey v. Cohart Refractories Corp., Inc*. 936 F.2d 805, 814 (5th Cir. 1991) (citing *E.E.O.C. v. Exxon Shipping Co.*, 745

F.2d 967, 976 (5th Cir. 1984)).  *See also Wallace*, 80 F.3d 1047 ("[N]either 'conclusory allegations' nor 'unsubstantiated assertions' will satisfy the non-movant's burden.") (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).  While the Court agrees Dean Stanford's statement could be construed as being discriminatory in nature, given the overwhelming evidence supporting Defendants' decisions, Dean Stanford's comments can be viewed as no more than a stray remark, which is insufficient to survive summary judgment.  *See Auguster v. Vermilion Parish School Bd.*, 249 F.3d 400, 404-05 (5th Cir. 2001).

Because Plaintiff has failed to raise a genuine issue of material fact on his claim, Defendants are entitled to summary judgment on same.  Defendants' motion for summary judgment is GRANTED.  Plaintiff's claims that the University and Defendants Juarez, Stanford, and Ureno discriminated against him based on his national origin are DISMISSED.

### D.     Retaliation

Plaintiff claims Defendants unlawfully retaliated against him for filing a grievance complaining about discrimination.  Plaintiff contends he was placed on probation, suspended, and expelled *because* he filed the grievance, in violation of 42 U.S.C. §1981.  Plaintiff sues President Juarez in his official capacity and Deans Stanford and Ureno in their individual and official capacities, pursuant to 42 U.S.C. §1983. Defendants move for summary judgment that (1) they are entitled to qualified immunity from Plaintiff's claims brought against them in their individual capacities, and (2) Plaintiff's claims brought against them in their official capacities are barred by the Eleventh Amendment.  For the reasons explained below, the Court finds Plaintiff has

failed to show there is a genuine issue of material fact for trial on his retaliation claims. As such, it is unnecessary for this Court to decide the issues of immunity. *Lawrence,* 163 F.3d 309, 313 (5th Cir. 1999).

A claim for retaliation under §1981 is governed by the same evidentiary framework applicable to claims of retaliation under Title VII, i.e. the *McDonnell Douglas* framework set forth above. *Raggs v. Mississippi Power & Light Co.*, 278 F.3d 463, 471 (5th Cir. 2002). To establish a prima facie case of unlawful retaliation, the plaintiff must show (1) that he engaged in protected activity, (2) that he suffered an material adverse action, and (3) that a causal link exists between the protected activity and the adverse action. *Medina v. Ramsey Steel Co., Inc*., 238 F.3d 674, 684 (5th Cir. 2001); *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309 (5th Cir. 2004).

A "causal link" is established when the evidence demonstrates that the adverse action was based in part on knowledge of the student's [employee's] protected activity. *Medina*, 238 F.3d at 684. In order to establish a causal link, the plaintiff must show that the defendant knew about the plaintiff's activity. *Id*. (citing *Manning v. Chevron Chemical Co.*, 332 F.3d 874, 883 (5th Cir. 2003), *cert. denied*, 540 U.S. 1107, 1124 S.Ct 1060, 157 L.Ed.2d 892 (2004)). A causal link can be severed if there is evidence that the ultimate decision maker did not merely "rubber stamp" the recommendation of the person with knowledge of the protected activity, but conducted an independent investigation in the circumstances surrounding the student's expulsion [employee's termination]. *Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998).

The Court finds Plaintiff has failed to establish a prima facie case of retaliation against Defendants Juarez, Stanford, and Ureno with respect to the suspension and

expulsion.  While it is undisputed that Plaintiff (1) engaged in protected activity when he filed his grievance, and (2) suffered an adverse action when he was suspended and expelled form the University, the Court finds Plaintiff has not put forth sufficient evidence to demonstrate a causal link between the grievance being filed and those sanctions imposed upon him.

The evidence shows that any causal link that may have been present was severed. None of the named defendants made the final decision to suspend or expel Plaintiff. The Court acknowledges that Dean Stanford knew Plaintiff had filed the grievance and made the initial decision to expel him for plagiarizing, but she was not the "ultimate decision maker."  The evidence shows Dean Stanford's decision to expel Plaintiff was reviewed by a Judicial Appeals Board "consisting of faculty, staff, and students" on May 5, 2008. According to Dean Stanford's affidavit:

> Mr. Mawle was personally present together with his advisor Ms. Gay Gilson and was provided the opportunity to cross-examine all witnesses and to call witnesses of his own.  Mr. Mawle presented documentation to the Board to support his position.  The Board after deliberation voted to uphold the sanction of expulsion.

Plaintiff appealed the Board's decision to Interim Provost Hy, who made the final decision to uphold Dean Stanford's decision to expel Plaintiff from the University.  In his letter to Plaintiff dated May 30, 2008, Interim Provost Hy explains:

> After carefully reviewing your appeal, including Exhibits, the other documents considered by the Judicial Appeals Board at the hearing, and listening to the recording of the Judicial Appeals Board hearing held on May 5, 2008, I have concluded that the sanction imposed was neither excessive nor inappropriate.

The Court also acknowledges that Dean Ureno knew Plaintiff had filed the grievance and made the initial decision to suspend Plaintiff for making the two

"threatening" statements.   However, Dean Ureno was not the "ultimate decision maker." The evidence shows Dean Ureno's decision to suspend Plaintiff was reviewed by the University Disciplinary Committee on March 5, 2008.   According to a letter attached to Dr. Remelius's sworn affidavit:

> The committee discussed at length the information provided by you [Plaintiff], your witnesses and the written affidavits.  It was the judgment of this committee that you were unable to explain why the three individuals had consistent information and detail that could only have been provided by you.  We also sought to understand your motivation for making the alleged statements that were perceived as threats by your peers.
>
> Therefore, after reviewing all the information available to this committee and based upon a preponderance of the evidence we have concluded that you are responsible for the charges against you and find you in violation of the student code of conduct …

Plaintiff appealed the committee's decision to Dr. Remelius in her capacity as Vice President for Student Affairs.  According to her affidavit, it was her "responsibility to determine if the evidence against Mr. Mawle was sufficient and whether Mr. Mawle had been allowed due process in accordance with the Student Handbook and the polices of the University."  Dr. Remelius, "[A]fter careful and thoughtful consideration" concluded that the evidence was sufficient to support the findings and conclusions of the University Disciplinary Committee and affirmed Plaintiff's one-year suspension.

Lastly, the only evidence "implicating" President Juarez is various letters to Plaintiff which reflect that President Juarez had been "copied" on those letters, i.e. he was forwarded copies of those letters.  Plaintiff offers no evidence to show that President Juarez made the final decisions or was otherwise involved in making the decisions to suspend and/or expel him from the University.

Assuming without deciding that Plaintiff has established a prima facie case of retaliation with respect to his probation, the Court finds Defendants have adequately demonstrated that there was a legitimate reason for placing Plaintiff on probation.  It is undisputed that Ms. Morales filed a repot with the University Police Department complaining that Plaintiff was sexually harassing her.  In his sworn affidavit, Plaintiff concludes the allegation was false and that Ms. Morales was the daughter of a University employee.  The evidence offered by Plaintiff does not substantiate his conclusions. Moreover, not only did Plaintiff did not appeal Dean Ureno's decision to place him on probation, in response to Defendants' motion for summary judgment, Plaintiff reiterates that he "is not alleging that he was denied due process in connection with this allegation." For the foregoing reasons, the Court finds Plaintiff has failed to raise a genuine issue of material fact that the decision to place Plaintiff on probation was made with retaliatory motive.

Because Plaintiff has failed to raise a genuine issue of material fact on his retaliation claims, Defendants Juarez, Stanford, and Ureno are entitled to summary judgment on same.  Defendants Juarez, Stanford, and Ureno's motion for summary judgment is GRANTED.  Plaintiff's claims that Defendants Juarez, Stanford, and Ureno unlawfully retaliated against him are DISMISSED.

ORDERED April 30, 2010.


HAYDEN HEAD
SENIOR U.S. DISTRICT JUDGE

30